Filed 6/11/26  P. v. Cerratos CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ROMAN CERRATOS et al.,<br><br>     Defendants and Appellants. | B340422<br><br>(Los Angeles County Super. Ct. No. YA099545) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelly M. Kelley, Judge.  Affirmed.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant Roman Cerratos.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Maricela Mercado.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Megan Moine, Deputy Attorneys General, for Plaintiff and Respondent.

The jury found Roman Cerratos and Maricela Mercado guilty of murder (Pen. Code,[1] § 187, subd. (a), count 1) and kidnapping (§ 207, subd. (a), count 2). The jury found true the special circumstance that the murder was committed in the commission of the kidnapping (§ 190.2, subd. (a)(17)), and the allegation that a principal to the murder was armed with a firearm (§ 12022, subd. (a)). As to Cerratos, the jury found true the allegations that he personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)–(d)), and personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)).

The trial court sentenced both defendants to life without parole for the special circumstance murder. Cerratos was sentenced to an additional term of 25 years to life for the firearm use enhancement. The court stayed the defendants' sentences for the kidnapping pursuant to section 654. The remaining enhancements were stayed or dismissed.

On appeal, Cerratos argues that the prosecutor violated his California and federal Constitutional right to due process by commenting in closing argument on Cerratos's failure to testify, and by giving his personal opinions. Mercado argues that her murder conviction must be reversed because the trial court incorrectly instructed the jury on aiding and abetting felony murder. She alternatively argues that her murder conviction must be reversed because the court refused to give an instruction on the required logical nexus between the kidnapping and the

---

[1] All further statutory references are to the Penal Code.

homicidal act. Mercado joins in any and all of Cerratos's arguments that inure to her benefit.

We affirm the trial court's judgment.

## FACTS

Prior to 2019, the victim, Jeffrey Appel, lived in Las Vegas with his father, Steven Appel.[2] Rena Pitchess, who was a partner in a CPA firm in Manhattan Beach, testified that she hired Appel in 2019 as an accountant for the tax season. Appel moved from Las Vegas to Redondo Beach because of this job opportunity, and because he was in a romantic relationship with Mercado. Mercado was previously married to Cerratos.

In early April, Pitchess noticed that Appel was acting agitated. On April 12, 2019, Appel checked into a Howard Johnson hotel in Torrance. He was scheduled to depart on April 16, 2019.

Steven testified that on April 15, 2019, he and Appel exchanged emails. Steven told Appel to "leave, to get out of [Redondo Beach]." Steven expected Appel to arrive in Las Vegas either that night or the next day.

Pitchess testified that on April 15, 2019, Appel was working, but he appeared nervous. He paced back and forth and left files on the floor instead of putting them on his desk. Pitchess told Appel to either sit down and work or leave because he was distracting her. Appel left the office around 5:00 or 6:00 p.m.

---

[2] Because Jeffrey and Steven Appel share the same last name, we refer to Steven Appel as Steven.

Nicholas Lee lived in an apartment complex on Torrance Boulevard next to a parking lot. At around 4:00 a.m. on April 16, 2026, Lee woke up because someone in the parking lot was screaming, "Help. Please help me. Stop." Lee looked out the window and saw a white, four-door Audi in the parking lot. There was someone in the passenger seat with their legs still outside of the vehicle. A six-foot tall man wearing a black hoodie was standing near the Audi. The man punched the person sitting in the passenger seat at least three times. Lee heard the person who was punched make a gurgling noise while attempting to yell. Lee testified, "It sounded like there was maybe blood or something in his—caught in his throat." The man punched the passenger about four more times. Lee thought the man threw about ten punches total. Lee did not see the person in the passenger seat punching back. Lee yelled " 'Hey!' " from his window. The man stopped punching the person in the passenger seat, and got into the back seat of the Audi on the passenger side. A woman got out of the driver's seat and tried to close the front passenger door. The front passenger's feet were inside the car, but his knees were sticking out. The passenger tried to kick and push the door open. The woman used her arms and body weight to push the door shut. She got into the driver's seat and drove the car out of the parking lot.

Yuri Ishikawa also lived near the Torrance Boulevard parking lot. She heard a man yelling " 'Help me' " and looked out her window. The man was in the passenger seat of a white four-door vehicle. The passenger side door was open and the man's legs were still outside. A woman standing near the car was trying to push the man into the car and shove the door closed with her arms and shoulder. The woman closed the door, walked

4

quickly to the driver's side of the car, and drove away. Ishikawa called 911.

Torrance Police Department Officer Matthew Jungers responded to the Torrance Boulevard parking lot at approximately 4:15 a.m. He discovered a shoe, a bloody knife, and what appeared to be fresh blood on the asphalt. The knife did not have a hilt.

Early in the morning on April 16, 2019, John Chaves was attending a training class for work and parked his car on Carson Plaza Drive. Chaves noticed a parked white car with blood on the passenger door. Chaves called to a friend who was also attending the training and they looked inside the car. Chaves saw what appeared to be a dead body "stuffed" into the passenger floorboard and seat area. Chaves saw some instructors approaching and told them to call 911.

Los Angeles County Sheriff's Department Deputy Adnan Ahmed responded to Carson Plaza Drive at 6:00 a.m. He found Appel in the front passenger area of the car covered in blood. Appel was pronounced dead at the scene. The Audi had a Nevada license plate and was registered to Appel. A trail of blood ran from the car to some buildings nearby. Deputy Ahmed obtained video surveillance footage of the area taken at 4:35 a.m. that morning. The video depicted a man with a cigarette exiting the Audi carrying two bags and a woman in dark clothing carrying an object in her hand. Both people ran where authorities later discovered the blood trail.

Los Angeles County Police Department Detective Steven Blagg also responded to the scene. He testified that Appel's body appeared to be stuffed into the right front passenger area of the vehicle. Appel's wallet was still in his possession. He did not

5

have a cell phone.  The detective found paperwork in the car indicating that Appel had checked into a Howard Johnson hotel.  Later, when Detective Blagg went to the hotel, it did not appear that Appel had checked out.

Los Angeles County Sheriff's Department crime lab forensic specialist Danielle Tiesma photographed the scene and collected evidence.  She observed possible blood stains on the exterior of the front passenger door of the vehicle.  There were possible blood stains on other parts of the exterior as well, and on the asphalt.  Tiesma followed the suspected blood trail.  It led into an open space between two buildings.  There was also a cigarette with what appeared to be blood on it in a trash can.  When Tiesma processed the interior of the Audi, she noted that Appel was only wearing one shoe.  There was possible blood on the back and side of the front passenger seat, on the inside of the window, and on the door frame.  An expended bullet and an unexpended bullet were recovered from the Audi.  The unexpended bullet was discovered underneath Appel's buttocks.  It had a head stamp with "Speer 45 Auto" on it.  A fired bullet was collected from Appel's right shoulder.  There were also expended bullet cartridge casings in the passenger's side door and on the floor of the rear passenger side seat.  There was a pair of black socks with an unexpended bullet attached to them by possible blood.  There was gunshot residue on Appel's hands and in the Audi.  The word "fuck" was scratched into the Audi's hood.

Medical examiner Dr. Richard Ou reviewed the autopsy report and the photos of Appel's body.[3]  Appel suffered five stab wounds to his torso, neck, and leg, in addition to cuts.  He

---

[3] At the time of trial, the coroner who performed the autopsy was deceased.

sustained three gunshot wounds, to his neck, right flank, and right leg. Dr. Ou concluded that Appel died from blood loss as a result of all of these injuries. Two of the expended bullets were recovered from Appel's body. A third bullet passed through Appel's leg and exited. There was methamphetamine present in Appel's body.

Jennifer Harbaugh, a close friend of Mercado's, testified that at about 8:00 a.m. on April 16, 2019, Mercado and Cerratos arrived at her house unexpectedly. Mercado was out of breath, Cerratos's hand was bleeding, and both of them were muddy. They took showers and Harbaugh gave them clean clothes to wear. Harbaugh then drove Mercado and Cerratos to Mercado's house.

The next day Harbaugh was on her way to work when she saw Mercado, Cerratos, and Mercado's daughter in Mercado's white BMW. They spoke briefly before Harbaugh left.

When authorities later searched Harbaugh's home, there were possible blood stains in the bathroom, bathtub, and shower drain.

Video obtained from a surveillance camera near Harbaugh's house depicted events on the morning of April 16, 2019. The video showed Cerratos carrying a trash bag toward a trash bin. He was wearing a white T-shirt with "Stage Fright" written on it.

On April 18, 2019, San Diego Police Department Officer Ruben Berton was patrolling near the Mexican border when a man flagged him down to report a backpack and handbag that the man discovered in the driveway of his apartment complex. The handbag contained Mercado's identification card and the key fob for a BMW.

On the same day, Mercado's BMW was found near the Mexican border in San Ysidro. The recovered key fob opened Mercado's BMW. In the trunk of the BMW, there were bags of clothing and passports for Mercado and her child. There was a white T-shirt with "Stage Fright" written on it in the back seat of the BMW.

On April 19, 2019, the police searched Mercado's house. They discovered a rifle case containing a shotgun and a plastic bag with various types of ammunition inside, including a Speer 45 cartridge. There was a bloody towel in the dining room. Police discovered a first aid kit on the counter in the upstairs bathroom. Detective Blagg ran the serial number for the shotgun and determined that it was not registered to anyone in California. The detective could not determine where the shotgun had been purchased. He did not investigate further because Appel was not killed with a shotgun. Detective Blagg did not have the Speer 45 cartridge analyzed for fingerprints because the crime lab no longer tested cartridges for fingerprints.

Los Angeles County Sheriff's Department senior criminalist Leslie Thompson obtained blood samples from the crime scene that she later analyzed. Thompson determined that the blood on the knife found in the parking lot was consistent with the DNA profiles of both Appel and Cerratos. Blood from samples taken from the parking lot where the knife was recovered were consistent with Appel's and Cerratos's DNA profiles. A sample taken from the blood trail on Carson Plaza Drive was consistent with Cerratos's DNA profile, as was blood from a sample taken from the cigarette that was recovered. Blood taken from samples from the exterior and interior of the Audi were consistent with Cerratos's DNA profile. Non-blood DNA samples from the

interior of the Audi were consistent with Cerratos, Mercado, and Appel.

Mexican agents apprehended Cerratos in June 2019, and Mercado in July 2019, and delivered them into Detective Blagg's custody. At the time that he was apprehended, Cerratos had a scar on his right hand between his thumb and index finger that was 1½ to 2 inches long. In Detective Blagg's experience, an assailant using a knife without a hilt may slip and cut their hand in this area.

## DISCUSSION

### A.    *Prosecutorial Error*

Cerratos contends that in making his closing argument, the prosecutor rendered his trial fundamentally unfair by improperly commenting on Cerratos's failure to testify and by offering the prosecutor's own opinions on the evidence. Cerratos claims (and Mercado joins) that either separately or in combination these alleged errors require reversal. We find no error.

Under state law, " ' "[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . ." ' (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Prosecutorial misconduct violates the federal Constitution when it results in a fundamentally unfair trial. (*Ibid.*) When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)" (*People v. Steskal* (2021) 11 Cal.5th 332, 350.)

### 1.    *Griffin* Error

Defendants first contend the prosecution committed error by commenting on their decisions not to testify, which improperly shifted the burden of proof to the defense. The contention lacks merit.

### a.    *Legal Principles*

"In *Griffin v. California* (1965) 380 U.S. 609 [(*Griffin*)], the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.) In accordance with this principle, the prosecutor may not argue to the jury that testimony or evidence is uncontradicted or unrefuted when such testimony could be provided only by the defendant. (*People v. Hughes* (2002) 27 Cal.4th 287, 371.) "[*Griffin's*] holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*Bradford*, at p. 1339.)

### b.    *Proceedings*

In her closing statement, Cerratos's counsel argued: "Each defendant is entitled to their own trial in this case, and as to each defendant the district attorney has to prove every single element of every charge independently and you have to decide whether they have met their burden of proof." Counsel

told the jury that even if they ignored all of the defense's arguments, "you still are going to come up to the same conclusion: that the district attorney has failed to prove this case beyond a reasonable doubt. Beyond any doubt. He's just failed to prove the case."

Counsel reminded the jury that the prosecution had "to produce either witnesses or evidence that proves the facts of their case, whether it be by direct evidence or circumstantial evidence." Counsel then stated, "We don't have to prove anything. But in order to prove their case, the D.A. has to be able to connect all the facts that they're presenting to you. Can't do it in a vacuum. You can't do each one separate and hope they come together."

As relevant here, counsel argued there was no proof that Cerratos supplied the murder weapons. Counsel reminded the jury that the criminalist testified she did not test the knife for handler DNA because it was overwhelmed by blood. Counsel did not believe this explanation because the knife did not appear to be overwhelmed by blood in photographs. If the criminalist had tested the knife for handler DNA, the evidence may have established that the knife belonged to Appel and not Cerratos. Counsel further argued there was no proof that Cerratos owned the gun used to shoot Appel. If the prosecution had tested the shotgun found in Mercado's house (which was not used in the killing) for fingerprints, testing may have shown that it was Appel's shotgun, from which the jury could draw the inference that the gun used in the killing likely belonged to Appel as well. Counsel theorized: "Mr. Appel took the gun to a knife fight, maybe; or maybe Mr. Appel took the knife and the gun to the fight."

11

Later, counsel returned to the subject of the shotgun. Counsel emphasized that after Detective Blagg determined the shotgun was not registered in California, he stopped investigating the shotgun because it was not used to kill Appel. Counsel argued that the detective should have investigated further, stating: "I think the only conclusions he's telling you is I'm just not a good detective."

In rebuttal, immediately following Cerratos's closing statement, the prosecutor stated:[4]

"So I wanted to start by reminding everybody that the People have the burden of proof. Absolutely. We need to prove every element of the crime, and I believe I have shown that. I have told you from jury selection up through closing argument that while you may have some questions, it's up to you to determine whether those questions really matter.

"All of those things the defense asked you about, all those questions, all those things that they claim we can't prove, those have nothing to do with the actual crime. Right. What happened before, [defense counsel is] right. Don't know. But we do know everything that happened from the Torrance parking lot stabbing all the way to them dumping the car and running away. Right.

"Both sides have the ability to subpoena witnesses. Both sides have the ability to produce evidence for you. Right. Neither side has to call all the witnesses or produce all the evidence, and we do have the burden of proof but both sides have that ability. *If there was something that was so important to their case, some witness or some piece of evidence they could have shown you. For example, there was some talk—*"

---

[4] The comments of which Cerratos complains are italicized.

Mercado's counsel objected that this was *Griffin* error, and Cerratos's counsel joined. The court overruled the objection.[5]

The prosecutor continued:

"There was talk of what more could have been done about the shotgun and who it was registered to. The defense has the same ability to investigate."

Both counsel again objected on the basis of *Griffin* error. The court told the prosecutor to move on.

The prosecutor argued: "But as I listened to both closing arguments I also struggled to determine if our theory of the case is wrong, *if the story I told you is wrong, then what is the right one?*"

Both counsel objected on the basis of *Griffin* error a third time. The court overruled the objection.

The prosecutor resumed: "All right. I told you how the evidence links together based on the evidence that you heard in court. All right. In their closing argument they asked questions. They tried to create doubt in your mind, but they really have no unified theory of what happened."

Both counsel objected a fourth time on the basis of *Griffin* error. The court sustained the objection and held a sidebar conference outside of the presence of the jury. Mercado's counsel argued that the prosecutor had improperly shifted the burden of proof to the defense. Counsel asserted the prosecutor inappropriately argued that the defense had to present an alternative theory of what occurred and also had to prove that alternative theory was correct. The defendants had no duty to

---

[5] Mercado's counsel appears to have been objecting on the basis of *Griffin* error in court, although the court reporter transcribed *Griffin* as *Green*.

prove anything. They could rely on the prosecutor's lack of evidence.

The prosecutor responded that he was not arguing the defense had the burden of proof. He was simply telling the jury that the defense had the ability to call witnesses and present evidence. The prosecutor claimed that he was setting up the argument that the defense's theories of the case were unreasonable. The defense had called all of the prosecutor's inferences into question, and had only offered speculative alternative theories of what occurred that were not based on the evidence.

Cerratos's counsel countered that the prosecutor had not made that particular argument to the jury. The prosecutor's statement that the defense failed to present evidence was not equivalent to stating that the defense had presented speculative theories. The defense had no duty to present evidence.

The trial court warned the prosecutor that he was getting "dangerously close" to telling the jury that the defendants had a duty to present evidence, thereby shifting the burden of proof. The court told the prosecutor to focus his argument on the state of the evidence and his theory of the case.

Cerratos's counsel requested that the court admonish the jury. The court agreed. When trial resumed, the court instructed the jury:

"Please remember that the sole burden of proof in this case and in all criminal cases is on the People. The defense has no burden of proof."

c.    *Analysis*

Although in trial the defendants objected to the two statements that they now challenge as *Griffin* error, at sidebar defense counsel did not argue that the prosecutor was commenting on the defendants' failure to testify. The substance of the objection was that the prosecutor was impermissibly shifting the burden of proof.

On appeal, defendants characterize the issue as one of *Griffin* error that resulted in an impermissible shift in the burden of proof. However, nothing in the prosecutor's argument indicates that he was commenting on Cerratos's or Mercado's decision not to testify. Among other things, Cerratos's counsel argued vigorously in her closing statement that Detective Blagg and the crime lab had not tested the knife or the shotgun as thoroughly as they could have, and that Detective Blagg was remiss for not attempting to trace the shotgun's registration beyond California. In response, the prosecutor first correctly emphasized that the People bore the burden of proof. The prosecutor then proceeded to argue that, if the defendants believed certain evidence such as the shotgun's registration was essential to their case, they had the power to obtain and present that evidence. Doing so was not improper. (*People v. Alaniz* (2017) 16 Cal.App.5th 1, 7 ["a jury's consideration of the defense's failure to call logical witnesses is proper and does not impermissibly shift the burden of proof"].) The prosecutor did not insinuate, nor could the jury have reasonably inferred, that Cerratos would be required to testify to establish the shotgun's

15

registration, or to describe the results of knife or shotgun DNA testing.

Cerratos takes out of context the prosecutor's comment "if our theory of the case is wrong, if the story I told you is wrong, then what is the right one"? The comment came on the heels of Cerratos's counsel's statement faulting the prosecutor's theory of the case based on an alleged failure to properly investigate the crimes. The jury would have understood that the prosecutor's use of the word "story" was not a commentary on Cerratos's or Mercado's failure to tell the jury what occurred by testifying, but rather a statement that the facts supported the prosecution's theory and that there was no reasonable contrary inference that could be drawn from the evidence. To the extent that this could have been error, it would be for its tendency to shift the burden of proof to the defense to present a coherent theory of what had occurred when the defense had no such duty, and not *Griffin* error. Here, however, there is no reasonable likelihood that the jury would have understood the prosecutor's comments in this manner. Both defense counsel and the prosecutor repeatedly emphasized that the defense did not have to prove anything, and that the burden rested on the prosecution to establish every element beyond a reasonable doubt based on the evidence that it presented. There was no prosecutorial error based on the challenged statements.

### 2.    **Personal Opinions**

Defendants next argue the prosecutor's use of the word "I" twice in closing argument was improper because the prosecutor was urging the jury to accept his personal beliefs regarding how

16

Cerratos and Mercado located Appel, which were not based on evidence in the record. This contention also lacks merit.

### a. *Legal Principles*

" '[A] "prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom[.]" ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 336.) However, "[i]t is misconduct for a prosecutor to express a personal belief in the merits of a case, rather than a belief based upon the evidence at trial." (*People v. Johnson* (1981) 121 Cal.App.3d 94, 102.) Prosecutors are " 'prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of [his or her] office behind a witness by offering the impression that [he or she] has taken steps to assure a witness's truthfulness at trial.' [Citation.]" (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269–1270.)

"[A]ny allegedly improper statements by the prosecutor must be considered in light of the entire argument. [Citation.] ' "In conducting [our] inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 789.)

b.    *Proceedings*

In his closing statement, the prosecutor argued that Cerratos and Mercado intended to kill Appel and had devised a plan to kill him:

"Jeffrey Appel was staying in a Howard Johnson hotel in a big county, in a big city, and somehow [Cerratos and Mercado] find him in his own car just a couple blocks away.  Somehow all three are together in the same place.  *I find it very hard to believe* that Mr. Appel would do that voluntarily.  So how did Mr. Cerratos find him?  Ms. Mercado must have known.  How did she know where to find him?  *The reasonable conclusion I have* is that Mr. Appel told Ms. Mercado where he would be staying after he moved out."

Cerratos's counsel objected following this statement.  The court overruled the objection, but admonished the jury:  "Ladies and gentlemen, these are the arguments of counsel.  It is their recitation of what they believe that the evidence has reasonably shown."

Soon thereafter the court ordered a recess and the parties discussed defense counsel's objections.

Cerratos's counsel asserted that the prosecutor's statement, which counsel remembered as " 'I personally believe' " was an improper personal opinion of the defendants' guilt.  Counsel moved for a mistrial, which the court denied.  The court, however, reviewed the record over a recess and addressed the matter further, stating:

"While the court reporter's transcript does reflect that [the prosecutor] used the word 'I' in two different sentences, upon

18

further review he did not use the word 'I' in the form of vouching or stating his belief as to the guilt of the defendants; rather he used it once in a sentence, 'I find it very hard to believe essentially that the defendants and Mr. Appel ended up coincidentally at the same location,' and he used it after that in a sentence where he said that, 'The reasonable conclusion I have as to how that occurred,' and then he went on to explain that.

"In neither of those context[s] did [the prosecutor] appear to be vouching or expressing his own personal belief as to the guilt of the defendants. Based on the court's further review of the court reporter's transcript the court's prior ruling in terms of denying the motion for a mistrial will remain."

        c.    *Analysis*

Here, the prosecutor was not referring to facts that were not in evidence or asking the jury to reach a conclusion based on evidence outside the record. He was highlighting the fact that it would be very unlikely in such a large city for Cerratos and Mercado to randomly encounter Appel in his car a few blocks away from the hotel that he had checked into when he decided to return to Las Vegas. The jury could reasonably infer that, given Mercado and Appel's romantic relationship, Appel would have told Mercado where he was staying while he finished his work for the 2019 tax season. The jury could also logically infer that Mercado shared this information with Cerratos, who was her ex-husband. Mercado was the logical link between the two men based on her respective relationships with each of them. It would also be reasonable to infer that Mercado and Cerratos planned their encounter with Appel, based on the fact that they

19

encountered each other not at Mercado's house but at Appel's car, which was parked close the hotel where he was staying. The prosecutor did not commit error by pointing out these connections to the jury. He did not rely on evidence that was outside the record or comment on either defendant's guilt.

## B.  *Instructional Error*

The trial court is required "to instruct on all of the elements of a charged offense [citations], including the mental state required to commit the offense and the union of that mental state and the defendant's act [citations]." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1160.) Failure to do so is error. (*People v. Saavedra* (2018) 24 Cal.App.5th 605, 615.)

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid*.) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

## 1. **Actus Reus Requirement for a Non-Killer Who Intends to Kill**

Mercado contends that the trial court's instructions to the jury regarding felony murder liability for a participant in a felony who is not the actual killer (§ 189, subd. (e)(2)), may have led the jury to find that, as a non-killer who intended to kill, Mercado could be liable for murder if she aided and abetted the actual killer in the underlying kidnapping but not in the killing itself. The contention lacks merit.[6]

### a. *Legal Principles*

Effective January 1, 2019, through Senate Bill No. 1437 (2017–2018 Reg. Sess.; Stats. 2018, ch. 1015), the Legislature amended section 189 to narrow the circumstances under which a jury may find a defendant guilty of murder under the felony murder rule. (*People v. Curiel* (2023) 15 Cal.5th 433, 448–449.) Now, a person who is a participant in a felony that is listed in section 189, subdivision (a)—which includes kidnapping—is guilty of felony murder only if the jury finds one of the following to be true:

"(1) The person was the actual killer.

---

[6] Mercado concedes that her counsel did not object to CALCRIM No. 540B at trial, but to avoid forfeiture, she argues counsel provided ineffective assistance, and that regardless, the trial court had a sua sponte duty to instruct the jury correctly regarding the elements of felony murder. Because we conclude that the claim of instructional error fails on the merits, we do not address the issue of forfeiture.

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in *the commission of murder in the first degree*.

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  (§ 189, subd. (e), italics added.)

### b.  *The Jury Instructions*

At trial, the court instructed the jury regarding non-killer liability for felony murder pursuant to section 189, subdivision (e)(2) under the standard version of CALCRIM No. 540B, as follows:

"A defendant may also be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death.  I will call the other person the *perpetrator*.

"To prove that a defendant is guilty of first degree murder under this theory, the People must prove that:

"1.  The defendant committed or aided and abetted Kidnapping;

"2.  The defendant intended to commit, or intended to aid and abet the perpetrator in committing Kidnapping;

"3.  If the defendant did not personally commit Kidnapping, then a perpetrator, whom the defendant was aiding and abetting, committed Kidnapping;

"4.  While committing Kidnapping, the perpetrator caused the death of another person;

"5A.  The defendant intended to kill;

22

"AND

"5B.  The defendant aided and abetted the perpetrator in the commission of first degree murder."

### c.    *Analysis*

Until very recently, the actus reus element of felony murder liability under section 189, subdivision (e)(2) was a matter of debate among the Courts of Appeal.  Some appellate courts concluded that a non-killer would be liable for felony murder if the non-killer aided a qualifying underlying felony. (See *People v. Lopez* (2023) 88 Cal.App.5th 566 (*Lopez I*); *People v. Morris* (2024) 100 Cal.App.5th 1016, review granted July 17, 2024, S284751 (*Morris I*); *People v. Lopez* (2024) 104 Cal.App.5th 616, review granted Nov. 13, 2024, S287162 (*Lopez II*); *People v. Taito* (2025) 115 Cal.App.5th 694, 704 (*Taito*).)  Other Courts of Appeal concluded that a non-killer must aid in the killing itself to be found guilty of felony murder.  (*People v. Kelly* (2024) 105 Cal.App.5th 162, review granted Nov. 26, 2024, S287341 (*Kelly*); *People v. Jackson* (2025) 110 Cal.App.5th 128, review granted June 11, 2025, S290457 (*Jackson*).)

In the briefs on appeal, the parties took opposing positions on the meaning of section 189, subdivision (e)(2) based upon these conflicting authorities.  Mercado argued that the phrase "in the commission of murder in the first degree" requires the jury to find the defendant aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the lethal act.  The People asserted that it was only necessary for the jury to find that the defendant aided, abetted, counseled, commanded,

induced, solicited, requested, or assisted the underlying felony, in this case the kidnapping.

Mercado emphasized that the Courts of Appeal disagreed regarding the meaning of section 189, subdivision (e)(2). She asserted that the language of the provision must be ambiguous because reasonable minds could disagree as to how to interpret it. Mercado contended that the trial court should have modified CALCRIM No. 540B, which "generally tracked the statutory language contained in section 189(e)(2)[,]" to instruct the jury "that in addition to participating in the underlying felony of kidnapping, the jurors were required to find both that appellant intended to kill and that she acted to aid, abet, encourage, solicit, or assist *in the killing* of the murder victim." (Italics added.)

After briefing concluded, our Supreme Court held in *People v. Morris* (2026) 19 Cal.5th 671, 681−686 (*Morris II*), that a non-killer must intend to kill and must assist the actual killer in the lethal act to be guilty of felony murder. Thus, the Supreme Court decided the proper interpretation of section 189, subdivision (e)(2) in Mercado's favor. However, in reaching its conclusion, the *Morris II* court held that "aiding 'the actual killer in the commission of murder in the first degree' means just that. The commonsense meaning of aiding or abetting 'the actual killer in the commission of murder in the first degree,' involves aiding or abetting the killing of a human being, and not just aiding another in the commission of an enumerated felony by an act that does not aid in the killing. (See *Jackson*, *supra*, 110 Cal.App.5th at pp. 166–167, [review granted] [collecting dictionary definitions of 'murder'].)" (*Id*. at 683.) In light of the Supreme Court's holding that the words of section 189, subdivision (e)(2) unambiguously state that the aider and abettor must aid in the lethal act,

Mercado's argument that the instruction is ambiguous because it "generally tracks" the statute fails.[7]  (See *People v. Kimbrel* (1981) 120 Cal.App.3d 869, 872 [jurors are expected to understand instructions as they are " 'commonly understood by those familiar with the English language' "].)

---

[7] We observe that the disagreement between the Courts of Appeal regarding the correct interpretation of section 189, subdivision (e)(2) did not arise from the plain meaning of its words.  In fact, no published opinion has held that the common meaning of "aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree" is to aid in an underlying felony rather than to aid in the killing itself.  The appellate courts and dissenting justices who concluded the phrase referred to aiding in the killing agreed that this understanding reflected the plain meaning of the words. (*Jackson*, *supra*, 110 Cal.App.5th at pp. 166–168; *Kelly*, *supra*, 105 Cal.App.5th at p. 172; *Morris I*, *supra*, 100 Cal.App.5th at pp. 1031–1032 (dis. opn. of Moore, J.); *Lopez I*, *supra*, 88 Cal.App.5th at p. 587 (dis opn. of Raphael, J.).)  The appellate courts that held the relevant actus reus for non-killer liability was commission of the underlying felony did not focus on plain meaning.  They relied instead on legislative intent as influenced by the Supreme Court's prior interpretation of the words "murder in the first degree" as the commission of the underlying felony, which the cases characterized as a "term of art."  (*Taito*, *supra*, 115 Cal.App.5th at p. 704; *Lopez II*, *supra*, 104 Cal.App.5th at pp. 621–622; *Morris I*, *supra*, 100 Cal.App.5th at p. 1026; *Lopez I*, *supra*, 88 Cal.App.5th at p. 578.)

## 2. <u>Logical Nexus Between the Kidnapping and the Lethal Act</u>

Finally, Mercado contends that the trial court erred by refusing to modify CALCRIM No. 540B to include optional language from the bench notes regarding the logical nexus between the underlying felony and the lethal act. We conclude that the trial court did not err.

### a. *Proceedings*

At trial, Mercado's counsel requested that the trial court add the logical nexus language from the Bench Notes for CALCRIM No. 540B to its instructions to the jury. The Bench Notes state:

"There is **no** sua sponte duty to clarify the logical nexus between the felony and the homicidal act. If an issue about the logical nexus requirement arises, the court may give the following language:

"**There must be a logical connection between the cause of death and the <insert felony or felonies from Pen. Code, § 189> [or attempted <insert felony or felonies from Pen. Code, § 189>]. The connection between the cause of death and the <insert felony or felonies from Pen. Code, § 189> [or attempted <insert felony or felonies from Pen. Code, § 189>] must involve more than just their occurrence at the same time and place.**" (Judicial Council of California Criminal Jury Instruction 540B, Bench Notes, citing

*People v. Cavitt* (2004) 33 Cal.4th 187 203–204; *People v. Wilkins* (2013) 56 Cal.4th 333, 347.)

Counsel argued that the logical nexus language was necessary in this case because the kidnapping and the murder were not connected.

The prosecutor objected to inclusion of the logical nexus language because the language did not clarify an element of the crime that the People were required to prove. The prosecutor expressed concern that the logical nexus language would create confusion and lead the jury to believe the prosecution had to prove an additional element of felony murder.

The court agreed that the logical nexus language could be confusing. The court did not believe that there was an issue regarding the logical connection between the kidnapping and the lethal act. The court told the parties they could argue the point to the jury, but that it would not add the language to the instruction.

Mercado's counsel argued that there was no evidence of when and where the homicide occurred. Counsel opined that the evidence indicated a temporal break between the two crimes. He asserted that the kidnapping and murder occurred at different locations.

The trial court disagreed with counsel's characterization of the evidence. The court stated that it was clear that the kidnapping began at the parking lot where the stabbing took place. The stabbing had to have occurred in the parking lot because the knife was left there. Moreover, based on the presence of gunshot residue inside the Audi there was very strong circumstantial evidence that the shooting occurred in the vehicle somewhere between the parking lot and the location

27

where the car was ultimately located, during which the kidnapping was still in progress.

### b. *Legal Principles*

A trial court's duty to instruct may encompass providing, upon request, "legally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions . . . ." (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) When considering whether to give a specific pinpoint instruction, the trial court should consider whether the instruction incorrectly states the law, is argumentative, duplicative, potentially confusing, or is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30, 32.) In other words, "[a] trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40.)

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that . . . is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Quarles* (2018) 25 Cal.App.5th 631, 634 ["We review a trial court's refusal to give a requested instruction de novo"].)

### c. *Analysis*

The trial court did not err by refusing to instruct the jury with the logical nexus language from the bench notes of CALCRIM No. 540B. The evidence presented at trial did not

28

raise a question regarding whether there was a logical connection between the kidnapping and the killing. A medical examiner opined that Appel died from blood loss due to a combination of stabbing and gunshot wounds. Appel was kidnapped and stabbed in the Torrance parking lot. Two witnesses testified to seeing the kidnapping as it took place in the Torrance parking lot. The bloody knife, which was recovered in the parking lot, had Cerratos's and Appel's blood on it. Blood samples taken from the asphalt of the parking lot matched Cerratos's and Appel's DNA profiles. Finally, gunshot residue and expended bullets were found inside the Audi. All of the evidence suggests that Appel was killed during the kidnapping and that Cerratos and Mercado kidnapped him for the purpose of killing him. There was not sufficient evidence for the jury to question the connection between the kidnapping and the stabbing and shooting that caused Appel's death.

**DISPOSITION**

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.

MOOR, J.

WE CONCUR:

HOFFSTADT, P. J.

KUMAR, J.*

---

\* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30